IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
EASTERN DIVISION

PUTMAN SOD & GRASS, L.L.C.,       )
                                  )
                    Plaintiff     )
                                  )
        vs.                       )       CASE NO. CV00-HGD-3448-E
                                  )
SOLUTIA, INC.,                    )
                                  )
                    Defendant     )

**ENTERED**

MAR 26 2003

## <u>MEMORANDUM OPINION</u>

The above-entitled civil action is before the undersigned United States
Magistrate Judge upon the consent of the parties in accordance with the
provisions of 28 U.S.C. § 636(c) and Fed.R.Civ.P. 73.  This case initially was
filed in the Circuit Court of Calhoun County, Alabama, on July 14, 2000.  It was
removed to this court on November 30, 2000.  A motion to remand filed by
plaintiff was denied on May 22, 2001.

In Count I of its complaint, plaintiff, Putman Sod & Grass, L.L.C.
(Putman), alleges a breach of contract by defendant, Solutia, Inc. (Solutia).
In Count II, Putman alleges promissory fraud in relation to its contract with
Solutia.  An answer was filed by Solutia denying plaintiff's claims.  Defendant
has filed a motion for summary judgment [Doc. #20], along with a supporting
Memorandum of Law [Doc. #22].  Plaintiff has filed a brief in opposition to the



summary judgment motion [Doc. #26], to which defendant has replied [Doc. #27]. Both parties have presented the court with the evidentiary submissions each considers significant. The undersigned magistrate judge has considered the briefs and submissions of the parties and makes the following findings and conclusions.

## FACTUAL BACKGROUND

Putman is a limited liability corporation located in Ashville, Alabama. It specializes in lawn care and related services. Putman is owned and operated by Danny Putman and his wife, Connie Putman. Their son, Jesse Putman, is a full-time employee who manages field operations for the business, which was started in 1995. [C. Putman Depo. at 13]. Putman began performing work for defendant, or its predecessor-in-interest, Monsanto Company, in 1997. Putman continued to provide grounds keeping services to Solutia until August 2001. The bulk of plaintiff's work was in the area of hydro seeding, mulching, erosion control and maintenance. [*Id.* at 21-22].

In the period immediately preceding July 1999, the grounds keeping jobs at Solutia had been split among three main contractors: (1) Allen Hall Excavating, (2) D&B Lawn Services, and (3) Putman Sod and Grass, L.L.C. In July 1999, Solutia decided to obtain the services of a single contractor to do the "routine" operations and maintenance (O&M) on certain Solutia properties.

2

[Hopper Depo. at 76-77].  The three existing contractors were presented with a bid request for this proposal, which was entitled "1999-2000 Remediation Operations & Maintenance Program; Anniston, Alabama; Request for Proposal" (request for proposal).

According to Solutia, the proposal sought bids to secure O&M work at the best cost.    More specifically, this work included the routine cutting and maintenance of the remediated areas, some minor excavation work, work that would be "over the liner material and not in any impacted materials," and general maintenance and general operations type work.    It also included maintaining the vegetative cover, cutting the grass, bush hogging, hydro seeding and similar such work.  [*Id.* at 60-61].  On August 11, 1999, Putman attended a pre-bid meeting hosted by defendant at which a Solutia employee, Jerry Hopper, and contractor, Earl Fansler, reviewed the scope of the work to be awarded, answered questions from the potential bidders, and provided a tour of the areas to be maintained.

Plaintiff bid on the contract, and on September 20, 1999, a letter was received from Alan Faust, Manager of Remedial Projects for Solutia, awarding plaintiff the two-year operations and maintenance contract.    After it was awarded the contract, plaintiff purchased safety glasses, snake chaps, and a new tractor with a cab on it to protect the operator from bees.  [J. Putman Depo. at 74].  It also invested in a smaller hydro seeder due to economic

3

concerns expressed by Hopper and Fansler about the larger one utilized by Putman in its previous work for defendant. [*Id.* at 102-04]. Putman also purchased other equipment that Putman thought was necessary to comply with the requirements set forth in the request for proposal, such as a Jeep. [*Id.* at 99].

Subsequently, in April of 2000, plaintiff complained to Solutia that it was not getting the work that it had been awarded under the contract. Jesse Putman stated that Putman Sod and Grass was not allowed to do the bush hogging, the weed-eating, the spraying of herbicides, the maintenance of erosion control and the maintaining of the roads, all of which was called for under the contract. Likewise, the grass was allowed to become overgrown before Putman was allowed to cut it. When he complained, Jesse Putman was advised by Jerry Hopper that Alan Faust had been replaced by Craig Branchfield who was "really cutting the budget around here." [*Id.* at 114-16].

Jesse Putman scheduled a meeting with Hopper and Branchfield to discuss the lack of work. The meeting took place in early 2000. [*Id.* at 119-20]. Branchfield advised Jesse Putman that he only had so much money and that he was going to spend more of it towards remediation and do less mowing. [Hopper Depo. at 74].

Testimony reflects that around the middle of 2000, Solutia put itself under a contingency financial plan and directed a reduction on the money spent

4

on maintenance.  The general order was that no more money than absolutely necessary was to be spent.  Jerry Hopper testified that as a result, Solutia allowed the grass to grow longer before it was cut and changed to rotational mowing of wildlife habitat areas.  [*Id.* at 139-44].  He also stated that a drought reduced the need for cutting the grass.  [*Id.* at 145].  In their earlier meeting with Branchfield, he had suggested that Putman begin to look for other jobs in addition to this one.  [J. Putman Depo. at 121].  Prior to this, Solutia had advised Putman that the contractor awarded the contract would be expected to be available when Solutia needed the work done.  [Hopper Depo. at 74].  Danny Putman testified that it did not begin to look for other jobs until the cutbacks were made in its work under the contract.  [D. Putman Depo. at 38-41].  Jesse Putman also testified that Solutia gave work covered by the Putman contract to other contractors such as Allen Hall.  [*Id.* at 127].

In explaining why Putman suffered a loss of work opportunities, Jerry Hopper stated that 63% of the work done by Putman prior to the contract was for reclamation work which was not included in the contract.  [Hopper Depo. at 131].  However, he later appears to qualify this statement by stating that hydro seeding is reclamation work, which is covered under the contract if it were performed in remediated areas.  [*Id.* at 136].

Jerry Hopper testified that he worked for either Solutia or its predecessor, Monsanto, from 1968 until the end of 2001.  [*Id.* at 11-12].  From 1997 until

5

2001, he worked in the Remediation Department.[1]  [*Id.* at 15].  He testified that Solutia solicited bids for this contract out of a desire to have one contractor perform all the routine operations and maintenance work.  He described this as the "minor" work.  [*Id.* at 97].  He further described the "minor" work to be any work "over the cover."[2]  He stated that "major" work was any work "below the cover" and, also, that a new project or new construction did not fall under the routine category.  However, Hopper recalled telling the bidders that the extent of the work would increase as new properties were brought into Solutia's program, but he qualified this recollection in his deposition by saying that, in using the term "new properties," he meant only properties connected to the Solutia plant and not any outlying Solutia properties.  [*Id.* at 110].

The scope of the work set out in the solicitation for bids states as follows:

## I.   Scope of Work

The following work scope is located within or adjacent to the Solutia Plant in Anniston, Alabama.  Recognizing the proximity of the Plant, it is required that all Workers have successfully completed the 40 hour Hazwoper training and/or the 8 hour yearly refresher course prior to performing any tasks within this Scope of Work.

---

[1] Solutia had an ongoing program to clean up areas in and around its facilities polluted by the inappropriate disposal of polychlorinated biphenyls (PCBs). This process is known as "remediation." After the remediation process, it was necessary to reclaim the property by planting grass, trees, etc., and to perform routine maintenance on the properties thus reclaimed.

[2] Presumably, this means over the ground-cover or the surface of the property.

6

Contractor shall furnish all labor, equipment, supplies, materials, supervision and all other things necessary to perform the following Work:

- South Landfill & Upper Diversion Berm
  - Mow or weed eat grass on landfill and adjacent areas
  - Fertilize as required
  - Routine maintenance on trees and plants (water, prune, etc.)
  - Maintain integrity of landfill cells
  - Maintain erosion control measures and rock levies on landfill cells
  - Routine maintenance on cap and cover of landfill

- West End Landfill
  - Mow or weed eat grass
  - Fertilize as required
  - Maintain erosion control measures on landfill
  - Routine maintenance on cap and cover of landfill
  - Routine maintenance on trees and plants (water, prune, etc.)

- East Side – Berm, Retention Pond, Outlet Structure
  - Mow or weed eat grass
  - Bush hog, as needed
  - Fertilize, as required
  - Routine maintenance on trees and plantings (water, prune, etc.)
  - Maintain erosion control measures
  - Routine maintenance on cover and slopes

- South Diversion Berm
  - Mow or weed eat grass
  - Bush hog, as needed
  - Fertilize, as required
  - Routine maintenance on trees and plantings (water, prune, etc.)
  - Maintain erosion control measures
  - Routine maintenance on cover and slopes

7

- North Side
  - Maintenance of mulch beds
  - Mow or weed eat grass
  - Bush hog, as needed
  - Maintenance of Railroad Ditch
  - Clear debris from inlet grate in ditch
  - Routine maintenance on cover and slopes
  - Maintain erosion control measures

- Montrose Avenue – 9 lots
  - Mow grass
  - Bush hog, as needed
  - Maintain restricted access

- Tree Maintenance
  - Three (3) locations exist; south fence line of plant site, southwest of Contractor's Shop, and northwest of PNP Department (Sweet's Valley)
  - Obtain and record moisture content monthly (Owner supplied equipment)
  - Obtain and record piezometer readings monthly (Owner supplied equipment)

- Misc [sic]
  - Repair rip rap as required
  - Maintain roadway systems
  - Emergency or necessary work resulting from storm events or plant excursions
  - Fence repair

[Doc. #22, Exh. D, Sub-exhibit A, at ¶ I].

Despite the extent of the work described in the solicitation, Hopper testified that he never stated that he expected the contract work to take priority over any other work. [*Id.* at 186]. Nevertheless, Hopper also testified that Putman was not given some road maintenance work which fell under the contract on a number of occasions because "Putman was not available or we

8

had called and contacted them and they were either on other work or a couple of times they were fishing in Florida or something, and it was not available, and at other times the work was awarded." [Hopper Depo. at 112-13]. However, Hopper was unable to produce any written notes or other documentation made prior to the filing of this lawsuit to support this statement. [*Id.* at 118-22, 167-68]. Hopper did produce one recorded conversation with Danny Putman that occurred in September 2001. However, this was after the lawsuit had been filed, after Putman had complained about the lack of work, and after Branchfield had suggested that it look for other jobs. In that conversation, Danny Putman reported that Jesse Putman was in Montgomery on a big job and that the time he could return to do the work for Solutia depended on whether he finished the Montgomery job. [*Id.* at 120-21].

Hopper was aware that Putman had purchased or intended to lease or purchase additional equipment in anticipation of using it for the Solutia contract work. This equipment included an additional tractor with an enclosed cab, a smaller, more cost-effective hydro seeder, and a Jeep. [Hopper Depo. at 169-70, 171-74].

Counsel for plaintiff asserts that Putman was paid only $33,000 by Solutia in 1999. However, plaintiff's Exhibit 12 is a Purchase Order from Solutia to Putman dated September 21, 1999, allocating $50,000 for the routine maintenance as set out in the contract. According to Jerry Hopper, this money

9

was allocated only for work done by Putman Sod and Grass and should not have covered any work done by Allen Hall. [*Id.* at 162-63, 165].

Plaintiff's Exhibit 13 is a Purchase Requisition dated May 9, 2001, wherein Solutia seeks to requisition another $25,000 supposedly to be used for further payments to Putman. Plaintiff's Exhibit 14 is a Project Change Order also dated May 9, 2001, which reflects that it is for the "[c]ontinuation of cost for routine O&M - mowing, bush-hogging & weed-eating." It bears the signature of Jerry Hopper. Documents 13 and 14 go together. [*Id.* at 184].

A third document, identified in the testimony of Jerry Hopper as Change Order number 4 and dated May 16, 2001, reflects a total amount allocated to the contract as being $105,000, of which all but $1,570, or approximately $103,000, had been disbursed and "should have" been paid by Solutia to Putman Sod. [*Id.* at 187-88]. None of this money ever should have been paid to Allen Hall Excavating Company. [*Id.* at 189].

Upon being shown certain invoices for work submitted by Allen Hall, Hopper admitted that at least some of it was work covered by the Putman contract. Hopper was shown an invoice from Allen Hall dated February 2000, referenced as PSG0070, which reflected payment of $1,420.23 to Hall for maintenance and cleanup, north side and south landfill. [Def. Exh. 23]. Hopper acknowledged that some of this work was work that was covered by the Putman Sod contract. [Hopper Depo. at 201-02].

10

When asked to explain why this work was not given to Putman, Hopper stated, "Well, only the fact that Allen Hall may have had equipment onsite and already there, and it was the most cost effective approach for Solutia." [*Id.* at 203]. When questioned further about why this was done, Hopper asserted that, under the bid proposal, Solutia retained "the right to administer the work in the most effective means and cost-effective means to Solutia." [*Id.* at 203-04]. He further testified that "there is documentation to substantiate that we can make a decision on what's most cost-effective and the most practical for Solutia to administer the work." [*Id.* at 204]. According to Hopper, this meant that if Solutia determined that it was more cost-effective, it could award work covered by the Putman contract to another contractor. [*Id.* at 204-05].

Hopper also acknowledged that work given to Allen Hall reflected in several other invoices dated at various times in 2000 was work Putman was qualified to do. [*Id.* at 206-12]. However, Hopper claimed that Putman was given a chance to do this work before it was given to Allen Hall. According to Hopper, if he had called Putman to do a job, there should "probably be some record" of it. [*Id.* at 207-08]. However, no such records have been provided by defendant.

In later testimony, Hopper asserted that section 3.8 of the contract between Solutia and Putman gave him the authority to give work to another contractor than Putman, wherein Solutia "reserves the right to reject any and

11

all bids and award the work on the basis most suitable to Solutia." [*Id.* at 240; Plaintiff's Exh. 2 at ¶ 3.8]. However, he acknowledged that the only "bid" submitted by Putman was not rejected. [Hopper Depo. at 240-41, 244]. Nevertheless, he asserted that the words "and award the work as most suitable for Solutia" allowed Solutia to give any work under the contract to another contractor if it was more cost-effective. [*Id.* at 244-47]. Hopper stated, "I would administer the work regardless of who the contract was, to what's most suitable to Solutia." [*Id.* at 247]. Hopper acknowledged that the contract was prepared by Solutia, not Putman Sod. [*Id.* at 243].

The Request for Proposal states, under terms and conditions, that "[buyer may change **specifications** . . . at any time." [Plaintiff's Exh. 2, Terms and Conditions, ¶ 10]. Under the heading of "**Specifications**" in the Request for Proposal, there is a subparagraph 2.0 entitled "**Scope of Work**." [*Id.*, Specifications, ¶ 2.0]. This particular part of the contract sets out only the general requirements of the contractor with regard to how the work awarded will be carried out. It does not detail the actual work to be done. Instead, it references Exhibit A as an outline of the work to be performed. [*Id.*, General Requirements, at ¶ 2.1]. At the end of the document is an attachment to the Request for Proposal labeled as Exhibit A which is also entitled "**Scope of Work**." This exhibit *does* outline the actual work to be performed under the contract. [*Id.* at Exh. A, Scope of Work].

12

According to the testimony of Jerry Hopper, the right to change the **specifications** includes the right to change the **scope of work**. [Hopper Depo. at 248]. Furthermore, defendant asserts that the right to change the **specifications** under the contract included the right to alter the **Scope of Work** as set out in Exhibit A. [See Doc. #22, Brief of Defendant, at 14].

## DISCUSSION

### Breach of Contract

Under general Alabama rules of contract interpretation, the intent of the contracting parties is discerned from the whole of the contract. *See Loerch v. National Bank of Commerce of Birmingham*, 624 So.2d 552, 553 (Ala. 1993). Where there is no indication that the terms of the contract are used in a special or technical sense, they will be given their ordinary, plain, and natural meaning. *See Ex parte Dan Tucker Auto Sales, Inc.*, 718 So.2d 33, 36 (Ala. 1998). If the court determines that the terms are unambiguous (susceptible of only one reasonable meaning), then the court will presume that the parties intended what they stated and will enforce the contract as written. *See id.* at 36; *Voyager Life Ins. Co. v. Whitson*, 703 So.2d 944, 948 (Ala. 1997). On the other hand, if the court determines that the terms are ambiguous (susceptible of more than one reasonable meaning), then the court must use established rules of contract construction to resolve the ambiguity. *See Whitson*, 703

13

So.2d at 948. Under those established rules of contract construction, where there is a choice between a valid construction and an invalid construction, the court has a duty to accept the construction that will uphold, rather than destroy, the contract and that will give effect and meaning to all of its terms. *See id.* at 948-49; *Sullivan, Long & Hagerty v. Southern Elec. Generating Co.,* 667 So.2d 722, 725 (Ala. 1995). Additionally, "if there exists inconsistency between two clauses of a contract which cannot be reconciled, the inconsistency must be resolved in favor of the prior clause, unless an intention to thereafter qualify is plainly expressed." *City of Fairhope v. Town of Daphne,* 282 Ala. 51, 58, 208 So.2d 917, 924 (1968); *see Whitson,* 703 So.2d at 949. Last, if all other rules of contract construction fail to resolve the ambiguity, then, under the rule of *contra proferentem,* any ambiguity must be construed against the drafter of the contract. *See Lackey v. Central Bank of the South,* 710 So.2d 419, 422 (Ala. 1998).

When the terms of a contract are ambiguous, the true meaning of the contract becomes a question for the fact-finder. *Mooney v. Henderson & Walton Women's Center-East, Inc.,* 684 So.2d 1340 (Ala.Civ.App. 1996). "If one must go beyond the four corners of the agreement in construing an ambiguous agreement, the surrounding circumstances, including the practical construction put on the language of the agreement by the parties to the

14

agreement, are controlling in resolving the ambiguity."[3] *Voyager Life Ins. Co.*, 703 So.2d at 949.

To the extent the failure to provide work to Putman was due to uncontrollable factors such as drought, rainfall, and storm events, the Request for Proposal specifically excludes liability to Solutia for its failure to assign work under the contract. [Plaintiff's Exh.2, Request for Proposal, at 14]. However, whether the contract allows Solutia to give work that otherwise would be covered by the Putman contract to another contractor if it deems it to be more cost-effective is open to question.

Defendant's argument that such action is allowed by the plain language of the contract is simply unfounded. The contract reserved to Solutia the right to reject any bid and to make changes to the specifications themselves, but it did not reserve the right to give the work to anyone it wished. The "specifications" contained in the contract include such things as the identity of the areas to be covered by the contract, and the jobs, such as bush hogging, weeding and road maintenance, to be performed in each. A "change" in these specifications would include such action as reducing the number of areas to be worked or changing the amount of mowing to be done. Giving the work to

---

[3] In such a case, this is the rule even despite the merger clause in the language of the contract which states that "[t]his contract is the complete understanding and statement of our agreement" [Plaintiff's Exh. 2 at 10] because the parol evidence is used to establish what the understandings of the parties were in the first place. This evidence does not change, alter or contradict the plain meaning of the contract; it explains a part of the contract, the meaning of which is otherwise unclear.

15

another contractor is not altering the specifications of the work to be done; it is altering the party who is designated to do the work. There is no language in the contract that allows such action by Solutia. The language allowing Solutia to make any "changes" in the contract is, at best, ambiguous. As defendant is the drafter of the document, this language is construed against it and in favor of Putman.

Furthermore, the fact that making "changes" does not include the right to change contractors is illustrated by reviewing the surrounding circumstances. The minutes of the pre-bid meeting of August 11, 1999, reflect that Solutia representatives advised the potential bidders as follows:

> It was identified that three (3) different tasks are now being undertaken separately. (Lawn care, reclamation/maintenance of vegetated grounds, and minor excavation/cap and cover projects.) The intent of the Contract is to combine these three tasks into one effort and award the Contract for a period of 2 years, commencing no later than 10/1/99.

[Plaintiff's Exh. 10, Minutes of Pre-bid Meeting of August 11, 1999, at ¶ 4, Scope of Work]. This language does not reflect any intent to continue to divide the work up among the three pre-contract contractors. The implication of this statement is that Solutia wished to use one contractor to do all the work for which it had previously used three, though the amount of such work that is to be done will vary depending on a variety of factors.

16

In addition, defendant's assertion that it only gave the work to Allen Hall when Putman was not available is contested by plaintiff. Plaintiff asserts that it was unable to start immediately on some projects for Solutia due to the necessity for Putman to find other work because Solutia was not giving it all the work that it was due under the contract. Thus, plaintiff claims that the failure to proceed in a timely fashion was, at least in part, caused by Solutia. Putman claims that Solutia is estopped from asserting Putman's failure to perform as a defense because Solutia was responsible for Putman's unavailability. To invoke the doctrine of estoppel, a party must demonstrate (1) that the party to be estopped had knowledge of the facts; (2) that the party to be estopped intended that his conduct be acted upon, or that the party asserting estoppel had a right to believe that the conduct was so intended; (3) that the party asserting estoppel was ignorant of the true facts; (4) that the party asserting estoppel relied on the other's conduct; and (5) that the party asserting estoppel was injured as a result of his reliance. *Reeves Cedarhurst Development Corp. v. First American Federal Savings and Loan Ass'n*, 607 So.2d 180, 183 (Ala. 1992). Whether such was the case and, if so, to what extent Solutia was responsible are factual determinations to be decided by the trier of fact.

Finally, there is no language in the contract which specifically allowed Solutia to give the work contracted for with Putman to any other contractor simply because it was more effective to do so. The language used by Solutia

17

at the pre-bid meeting reflects that it was the intent of the parties for Solutia to contract with a single contractor who would carry out all the different functions theretofore carried out by three separate contractors. If Solutia was free to assign the work in any manner it saw as cost-effective, this would effectively re-write the contract to say that Solutia could give the work to anyone other than Putman it wished, if it could get it done for less than it would cost under the contract with Putman. This would remove all incentive for Putman Sod to enter into such a contractual relationship. It would only get the work when its standing bid was the lowest for the job among the competing contractors. This would leave Putman Sod stuck with offering to do the work at a set price; whereas, the other contractors were free to revise their prices to underbid Putman for this work, thereby making it more "cost-effective" for Solutia to use a contractor other than Putman. It is illogical that any business would put itself in such a no-win situation.

There is, in the record, evidence that Allen Hall Excavating did work which was covered by the Putman contract. Though the purchase orders reflect that the work done by Allen Hall were paid under different Purchase Order numbers than that used by plaintiff, there is also evidence that approximately $103,000 was used for payments made pursuant to the Putman contract of which Putman asserts it only received $33,000.

18

As noted above, the failure to give Putman Sod work was sometimes due to weather or other uncontrollable situations. To the extent this is so, defendant is not liable under the terms of the contract. However, not every failure to give work covered by the contract to Putman Sod was the result of factors beyond the control of Solutia. Thus, the undersigned concludes that there are questions of fact to be resolved in this case relating to whether defendant breached its contract with plaintiff when it gave work covered by the contract to others.

## **Promissory Fraud**

Plaintiff asserts that defendant never intended to give it the work promised under the contract. This is a claim for promissory fraud. The elements of promissory fraud are (1) a false representation, (2) of a material existing fact, (3) reasonably relied upon by the plaintiff, (4) who suffered damage as a proximate consequence of the representation, (5) proof that, at the time of the misrepresentation, the defendant had the intention not to perform the promised act, and (6) proof that the defendant had the intent to deceive. *Russellville Production Credit Ass'n v. Frost*, 484 So.2d 1084, 1085-87 (Ala. 1986). The *Frost* court also stated:

> [A] reckless misrepresentation cannot constitute fraud
> where the alleged misrepresentation relates to some
> future event. Where the misrepresentation relates to
> some future event, it must be shown that the person

19

> making the representation intended  not to do the act
> promised at the time the misrepresentation was made.

*Id.* at 1087. *See also, Wright v. AmSouth Bancorporation*, 320 F.3d 1198,

1204 (11th Cir. 2003).

The testimony of Danny Putman reflects that he does not have any

evidence of promissory fraud.

> Q.  * * * Can you tell me what promises Solutia made
> to you that you believe they did not deliver on?
> * * *
>
> A.  I believe they gave us a contract in good faith to
> continue with our work that we were doing before the
> contract.
> * * *
>
> Q.  Do you have any reason to believe that Jerry
> Hopper told you about the work and at the time he told
> you about it he did not intend to give it to you?
> * * *
>
> A.  I don't believe he intended to, no, sir.
> Q.  Okay, So you think he had good intentions at the
> meeting?
> A.  I think he had good intentions.

[D. Putman Depo. at 48-49].  The testimony clearly shows that, after the

contract was awarded, Solutia ran into financial difficulties.  Hopper testified

that in about June 2000, he was advised "not to spend a dollar that we didn't

have to spend."  He was instructed to be more cost-conscious and cost

effective.  [*Id.* at 139-44].  Hopper believed there was language in the contract

to substantiate that Solutia could make a decision based on what it considered

to be the most cost-effective and practical manner, in order to effectuate this

directive.  [*Id.* at 204].

20

The only evidence produced by plaintiff which it asserts to be evidence of promissory fraud involves certain deposition statements of Jerry Hopper, outlined below, wherein he states that it was Solutia's intent at the inception of the contract to administer the work in the manner most cost-effective to Solutia. A close reading of the contract reflects that Solutia's "cost-effective" position may be the result of confusion between its right to reject bids under the bidding process with its obligation, once the contract was awarded, to comply with the terms and conditions of the contract. However, this confusion does not automatically translate into an intent to deceive at the time of the creation of the contract.

When asked to point out any such language, Hopper stated that he was referring to § 3.8 under the contract which states that with regard to bid evaluation, Solutia "reserves the right to reject any and all bids and award the work on the basis most suitable to Solutia." [Id. at 240; Plaintiff's Exh. 2 at § 3.8]. Despite the reference to "bid evaluation" in the first clause of this statement, Hopper believed he had the authority under the contract to give the work to another contractor if it was more cost-effective to do so and believed both parties knew this.

> Q. But just so we're clear on this, Solutia, by and through you as its remediation specialist, never intended to award all the work covered in this bid proposal if you felt like it was more suitable from Solutia's cost analysis to award it to another contractor, correct?

21

A. It was my responsibility to administer the work in the most suitable means to Solutia.

Q. I realize that. But that wasn't my question. You never intended to award the work to the contractor who was awarded the bid if, in your judgment, it was more suitable and more cost-efficient from Solutia's standpoint to give it to a competitor or another contractor, correct?

A. I would administer the work regardless of who the contract was, to what's most suitable to Solutia.

Q. That was your intent at the time that y'all negotiated and entered into this proposal?

A. Yes, and it was understood - -

Q. You've answered.

A. It was understood - -

Q. I didn't ask you what was understood. That's all.

Q. One last question Mr. Hopper. I understand that the document speaks for itself, and we don't need to wrangle over the interpretation, but is it your understanding that Solutia reserved the right to change the specifics of this contract?

A. Correct, Yes.

[Hopper Depo. at 246-48].

Thus, even assuming that plaintiff has provided evidence of a material representation by Solutia, it has not provided any evidence that reflects an intent to deceive at the time the representation was made. There is no evidence to contradict the testimony of Hopper that he genuinely believed he

22

was doing something which was allowed under the terms of the contract. Therefore, plaintiff's claim of promissory fraud is without merit.

### CONCLUSION

Based upon the foregoing analysis, defendant's motion for summary judgment as to plaintiff's claim of breach of contract is due to be denied. The motion for summary judgment as to plaintiff's claim of promissory fraud is due to be granted. A separate order in conformity with this Memorandum Opinion will be entered contemporaneously herewith.

DONE this ____26th____ day of March, 2003.

_____
HARWELL G. DAVIS, III
UNITED STATES MAGISTRATE JUDGE

23